# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

WILLIE MOSLEY; KENNARD SMITH;      :      CIVIL ACTION NO.: CV612–022
EDDIE MANN, JR.; and      :
ALPHEAUS PUTMON,      :
     :
         Plaintiffs,      :
     :
     v.      :
     :
     :
DONALD JARRIEL; BRUCE CHATMAN;      :
DR. TOMMY LEE JONES; DR. DEAN      :
BROOME; JOHN PAUL; BRIAN OWENS;      :
and SAM OLENS,      :
     :
         Defendants.      :

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiffs filed, through counsel, an Amended Complaint contesting certain conditions of their confinement while they were incarcerated at Georgia State Prison ("GSP") in Reidsville, Georgia. Defendants filed a Motion for Summary Judgment. Plaintiffs filed a Response. Defendants filed a Reply. For the reasons which follow, Defendants' Motion should be **GRANTED**.

## STATEMENT OF THE CASE

Plaintiffs contend that they became infected with tuberculosis ("TB") while housed at Georgia State Prison ("GSP"). Specifically, Plaintiffs contend that former Plaintiff Dexter Fitzpatrick was housed at GSP from June 2009 until March 16, 2010, and started experiencing symptoms of TB as early as December 2009. Plaintiffs assert

that before Fitzpatrick was diagnosed with TB, he was housed in the same dormitory as Plaintiffs. Plaintiffs also assert that, as a result of Fitzpatrick being housed with them, Plaintiffs were infected with TB. Plaintiffs claim that GSP housed more inmates than it was designed to hold and is poorly ventilated, conditions which led to an ample breeding ground for the TB bacteria. (Doc. No. 36).

Defendants contend that they were not aware of Fitzpatrick's alleged condition and thus, cannot be deemed to be deliberately indifferent to his condition or Plaintiffs' health and safety as a result of their confinement with Fitzpatrick. Defendants aver that there is no evidence to support Plaintiffs' contentions regarding the conditions at GSP. Defendants also aver that there is no evidence in support of the contention that they delayed or hindered Plaintiffs Putman's and Mosley's medical treatment. Defendants allege that they are entitled to qualified immunity. Defendants also allege that Plaintiff Mosley's claims should be dismissed because he failed to exhaust his administrative remedies.[1]

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant[s] show[ ] that there is no genuine dispute as to any material fact and that the movant[s are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving part[ies]. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp.2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[1] While the undersigned recognizes Defendants have more information at their disposal regarding exhaustion arguments, this contention will not be addressed, as this Court has already disposed of Defendants' exhaustion assertions. (Doc. Nos. 55, 58).

AO 72A
(Rev. 8/82)

242 (1986), and <u>Verbraeken v. Westinghouse Elec. Corp.</u>, 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving parties bear the burden of establishing that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. See <u>Williamson Oil Co., Inc. v. Philip Morris USA</u>, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant[s are] entitled to judgment as a matter of law." <u>Moton v. Cowart</u>, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving parties would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving parties' case or that the nonmoving parties would be unable to prove their case at trial. <u>See id.</u> (citing <u>Celotex v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving parties. <u>Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla.</u>, 630 F.3d 1346, 1353 (11th Cir. 2011).

## DISCUSSION AND CITATION TO AUTHORITY

Defendants assert that they were unaware of Fitzpatrick's condition.[2] Defendants contend that Plaintiffs cannot show that, even if they were exposed to Fitzpatrick, that any Defendant was deliberately indifferent to Plaintiffs' conditions of confinement or to their health, as there is no evidence that any Defendant had

---

[2] Fitzpatrick is no longer a Plaintiff in this cause of action. However, discussion of Fitzpatrick's condition is essential to a discussion of whether Defendants were deliberately indifferent to Plaintiffs' health and safety.

AO 72A
(Rev. 8/82)

subjective knowledge that Fitzpatrick posed a substantial risk of serious harm at any time before he was transferred to the infirmary and knowingly disregarded that risk.[3]

## I.    Fitzpatrick's Condition[4]

Fitzpatrick was assigned to GSP on November 28, 2008. Fitzpatrick had previously had a positive Purified Protein Derivative ("PPD") skin test in 2006, which is the "typical means to test for TB infection". (Doc. No. 125-1, p. 2). Fitzpatrick was considered to have latent TB infection ("LTBI"), which only has as a symptom a positive PPD skin test and which is a non-contagious germ. Fitzpatrick had negative screens for active TB on December 15, 2008, and December 29, 2009. Fitzpatrick was seen in GSP's medical unit on several occasions in 2009 and made no complaints regarding conditions which could be considered symptoms related to active TB, such as coughing, fever, weight loss, bloody sputum, or night sweats. Fitzpatrick was in disciplinary segregation from December 4, 2009, through January 10, 2010, and made no complaints to medical staff during that time period. (Doc. No. 140, ¶¶ 180–81, 194–96). Fitzpatrick was seen in medical on January 11, 2010, and complained of knee and back pain but not weight loss, coughing, bloody sputum, fever, or night sweats. Fitzpatrick received the results of his x-rays on January 25, 2010. (Id. at ¶¶ 199–200, 206–07). On February 4, 2010, Fitzpatrick complained of "cold and hot sweats", vomiting and having

---

[3] Defendant Chatman did not become warden at GSP until December 2010, which was after Fitzpatrick had been transferred to Augusta State Medical Prison. (Doc. No. 126-3, p. 3; Doc. No. 140, ¶ 5; Doc. No. 145, p. 8). Accordingly, any discussion regarding deliberate indifference based on Fitzpatrick's condition necessarily will not include Defendant Chatman, as Plaintiffs recognize. (Doc. No. 138, p. 26).

[4] The undersigned has attempted to recount the parties' Statement of Facts. This task was made more difficult than necessary given Plaintiffs' counsel's: failure to admit or deny large portions of Defendants' Statement of Material Facts (see Doc. No. 140, ¶¶ 343–397); repetition of stock answers (see id. at ¶¶ 55–56, 58-59); or failure to provide a statement and/or citation to the record in support of a denial in several instances (see id. at ¶¶ 40, 42, 176, 221). The citations are provided as examples only and are not meant to be exhaustive.

AO 72A
(Rev. 8/82)

headaches for three weeks' time, a cough, a sore throat, and a runny/stuffy nose. (Doc. No. 125-1, p. 6). After examination, Fitzpatrick was prescribed medications and instructed to return if his conditions continued or worsened. Fitzpatrick complained on February 6, 2010, of nausea, vomiting, hot/cold sweats, and a burning pain which worsened when he swallowed or ate. He was given an injection to help with his nausea and acetaminophen for his fever. Fitzpatrick was instructed to return to medical if his symptoms continued or worsened. Fitzpatrick returned to medical on February 10, 2010, and reported that, while the injection gave him some relief, he still had nausea and was vomiting, though he was not vomiting blood. An x-ray was taken to rule out an obstruction, and Fitzpatrick was given medication for his nausea, instructed to follow a liquid diet for three (3) days, and told to return in a week, or sooner if needed. (Doc. No. 140, ¶¶ 219–32). Fitzpatrick's x-ray did not reveal an obstruction. Fitzpatrick returned to medical on February 15, 2010, and complained of vomiting with green and brown in it and pain with bowel movements. Fitzpatrick did not report having nausea, coughing, bloody sputum, or night sweats, but he did report being hungry. Fitzpatrick had abdominal tenderness and a fever and was taken to a local hospital, where the doctor diagnosed Fitzpatrick as having H. pylori and gastritis.[5] Fitzpatrick was returned to GSP, reported no symptoms associated with active TB, and was given his prescribed medications. Fitzpatrick was seen on February 18, 2010, and reported that he was feeling better, did not report coughing, bloody sputum, fever, or night sweats, and was instructed to finish his medications. Fitzpatrick had a chest x-ray taken on February 22, 2010, which was read two (2) days later. The radiologist's impression was that

---

[5] H. pylori is a stomach bacterium which causes nausea, vomiting, and a burning sensation in the abdomen. Gastritis is an inflammation of the stomach lining and can be caused by excessive vomiting and H. pylori. (Doc. No. 140, ¶¶ 245–46).

5

Fitzpatrick had pneumonia, but TB or an obstructive bronchial lesion could not be excluded. (Id. at ¶ 271). Fitzpatrick was again seen at medical on March 2, 2010, which is the same date Defendant Jones read Fitzpatrick's x-ray. Defendant Jones diagnosed Fitzpatrick with pneumonia and admitted him to the infirmary. Defendant Jones ordered a CT scan on March 4, 2010, to rule out whether Fitzpatrick had an obstructive lesion to the upper right lobe of his lungs. Fitzpatrick had another chest x-ray taken while he was in the infirmary on March 11, 2010. On March 15, 2010, Dr. Jones reviewed this x-ray, which revealed some improved aeration in the lungs with "a persistent infiltrate[,]" which was a finding that was "suspicious of TB." (Doc. No. 125-1, p. 9). Fitzpatrick was transferred to Augusta State Medical Prison ("ASMP") the next day, and he was later diagnosed as having active TB.

## II.    Deliberate Indifference[6]

The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon a prison official to take reasonable measures to guarantee the safety of inmates. The standard for cruel and unusual punishment, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994). However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions

---

[6] While Defendants' alleged deliberate indifference to Fitzpatrick's medical needs is not an issue before the Court, the standard applicable to such a claim provides a helpful analytical framework for those claims which are pending.

AO 72A
(Rev. 8/82)

sufficiently harmful to evidence deliberate indifference to serious medical needs." Hill v.

DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

In order to prove a deliberate indifference claim, a prisoner must overcome three obstacles. The prisoner must: 1) "satisfy the objective component by showing that [he] had a serious medical need"; 2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and 3) "show that the injury was caused by the defendant's wrongful conduct." Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007). A medical need is serious if it "'has been diagnosed by a physician as *mandating* treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill, 40 F.3d at 1187) (emphasis supplied). As for the subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Under the subjective prong, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Goebert, 510 F.3d at 1327. It is legally insufficient to sustain a cause of action for deliberate indifference to serious medical needs simply because the inmate did not receive the medical attention he deemed appropriate. See Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (noting that a mere difference of opinion as to a prisoner's diagnosis or course of treatment does not support a claim under the Eighth Amendment). "Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care." Clas v. Torres, No. 13-11770, 2013 WL

AO 72A
(Rev. 8/82)

6570584, at *2 (11th Cir. Dec. 16, 2013) (quoting Estelle, 429 U.S. at 105–06). "The question of whether additional diagnostic techniques or alternate forms of treatment should be employed constitutes a classic example of a matter for medical judgment and does not support an Eighth Amendment claim." Id. (internal citation omitted).

### A.    Plaintiffs' Exposure to Fitzpatrick

Defendants assert that Plaintiffs cannot show that any of them subjectively knew at any time before Fitzpatrick was transferred to the infirmary that he posed a substantial risk of serious harm to Plaintiffs' health and safety and knowingly and recklessly disregarded that risk. Defendants contend that Fitzpatrick did not exhibit "classic symptoms of active TB." (Doc. No. 125-1, p. 17). Defendants also contend that Fitzpatrick's main complaints were nausea and vomiting, which are not typical TB symptoms. Defendants further contend that Fitzpatrick's weight loss could be explained by his prolonged vomiting. In fact, Defendants allege that an outside doctor diagnosed Fitzpatrick as having H. pylori and gastritis, which were consistent with his symptoms, and Fitzpatrick reported some improvement in his conditions after receiving treatment. Defendants note that Fitzpatrick reported having a cough on two (2) occasions— February 4, 2010, and March 2, 2010, the date he was admitted for entrance into the infirmary. Defendants allege that Fitzpatrick's reports of hot/cold sweats were not of the same kind typically associated with TB. Defendants also allege that Fitzpatrick's intermittent fevers were consistent with many other conditions, including pneumonia.

Defendants aver that Fitzpatrick was seen on numerous occasions between February 4 and March 3, 2010. Defendants also aver that Fitzpatrick was assessed, his symptoms were evaluated and treated, tests were ordered, and recommendations of

AO 72A
(Rev. 8/82)

outside professionals were followed. Defendants contend that TB was not "the obvious cause[ ]" of Fitzpatrick's symptoms, and diligent attempts were made to uncover the cause of his problems. (Id. at p. 18). Defendants assert that Defendant Broome never examined or evaluated Fitzpatrick and that Defendant Jones only did so after Fitzpatrick was admitted to the infirmary. Defendants also assert that Defendants Broome and Jones signed encounter forms and physician's notes which the individuals who examined Fitzpatrick prepared, but there was nothing in these forms which indicated that Fitzpatrick had active TB. Defendants Jarriel and Paul contend that they were entitled to rely on the opinions of the medical personnel who treated Fitzpatrick, and those individuals did not recognize Fitzpatrick as having active TB. Defendants state that the most Defendants Jarriel and Paul knew about Fitzpatrick's condition was that he was vomiting, he had been seen regularly by the medical staff, he was seen by an outside doctor, and no medical care provider felt that Fitzpatrick needed to be segregated from other inmates.

Plaintiffs assert that Fitzpatrick's February 22, 2010, x-ray indicated that TB could not be ruled out as the cause of Fitzpatrick's symptoms. Plaintiffs also assert that, even though Defendant Jones knew about Fitzpatrick's symptoms and that TB could not be ruled out, he allowed Fitzpatrick to go back to general population on March 2, 2013. Plaintiffs further contend that Fitzpatrick was not taken to the infirmary until the next day when a sergeant arranged for him to be taken to the infirmary because he was too weak to stand during that morning's inspection. Plaintiffs contend that Defendant Jones did not arrange for Fitzpatrick's transfer to Augusta State Medical Prison ("ASMP") until 13 days after he was placed in GSP's infirmary. Plaintiffs allege that, in mid-January 2010

AO 72A
(Rev. 8/82)

when he was in the general population, Fitzpatrick told "corrections and administration staff, including lieutenants, sergeants[,] and the officers [who] supervised chow (inmate meals) about his illness and symptoms." (Doc. No. 138, p. 7). Plaintiffs also allege that Fitzpatrick informed Defendant Jarriel during inspection that he was "sweating, throwing up[,] and losing weight like [he] got(sic) a disease." (Id. at p. 8). Plaintiffs further allege that Defendant Jarriel saw Fitzpatrick vomiting and that he informed Defendant Jarriel that he had visited medical because of his symptoms with no resolution. Plaintiffs contend that Fitzpatrick informed Defendant Jarriel during his smoke breaks that he was sick and that medical was not addressing his symptoms. Plaintiffs state that Defendant Jarriel "dismissed their entreaties for help for Fitzpatrick, saying that medical would handle it or that medical was working on it." (Id. at p. 9).

"For a claim . . . based upon a failure to adequately screen, treat and quarantine an inmate for tuberculosis and the concomitant habitual exposure of inmates to other inmates who have active (i.e., contagious) [TB], [a prisoner] must present factual allegations supportive of a showing that he is incarcerated under conditions posing a substantial risk of serious damage to his health." Helling v. McKinney, 509 U.S. 25, 35 (1993). The second component is that the "prison official must have a 'sufficiently culpable state of mind[,]' since 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" Id. (internal citation and punctuation omitted). In "conditions-of-confinement cases that state of mind is one of 'deliberate indifference' to inmate health or safety[.]" Id. (citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate

AO 72A
(Rev. 8/82)

health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Defendant Jones was the Medical Director at GSP until September 2010, at which time Defendant Broome became the Medical Director. Defendant Jones saw those inmates who needed to be in the infirmary and tended to those inmates and supervised the physician's assistants ("PAs") and nurses who provided medical care and treatment to inmates. (Doc. No. 152, pp. 27, 34). Defendant Jones only would sign medical orders from the medical care providers if there was nothing "out of the ordinary" on the medical chart. (Doc. No. 126-10, p. 4). Defendant Jones' first personal involvement with Fitzpatrick was on March 2, 2010, when PA Cheatam saw him in the medical unit and assessed Fitzpatrick as having pneumonia. (Id.). Defendant Broome's primary duties as a physician at GSP were to see the chronic care patients, and he would not have occasion to see an inmate otherwise. (Doc. No. 144, p. 15). In fact, Defendant Broome only reviewed and signed the physician's orders and authorized medications based on the information contained in those orders regarding Fitzpatrick. (Doc. No. 126-11, p. 20). Defendant Jarriel was the Warden at GSP until December 2010, and Defendant Paul was the Deputy Warden of Care and Treatment at all relevant times. Defendants Jarriel and Paul did not have supervisory control or power over the medical personnel at GSP, as the medical personnel were not employed by the GDOC. (Doc. No. 126-1, p. 3; Doc. No. 150, pp. 25, 27). Defendant Paul stated that his function as Deputy Warden of Care and Treatment was to facilitate the inmates'

AO 72A
(Rev. 8/82)

movements for medical appointments, and he otherwise had nothing to do with medical issues. (Doc. No. 126-2, p. 3).

Fitzpatrick stated that he began having night sweats while he was in isolation, which was between December 4, 2009, and January 10, 2010. Fitzpatrick attributed this to having a cold, and medical personnel gave him medications for that. (Doc. No. 126-8, pp. 28, 39–40). Fitzpatrick also stated that he started vomiting and losing weight, and he even threw up in front of officers. (Id. at p. 28). Fitzpatrick stated that he did not vomit in front of Defendant Jarriel, but he was "informed that it was an ongoing problem[,]" (id. at p. 69), presumably because Fitzpatrick told Defendant Jarriel that he was sick, throwing up, losing weight, and that he had been to medical dozens of times.[7] (Id. at pp. 60, 64). Fitzpatrick also stated that Defendant Jarriel told him that he would get Fitzpatrick back to medical so that medical personnel could figure out what was happening with him. (Id. at pp. 64–65). Fitzpatrick testified that he could not answer when or if Defendant Jarriel learned he had active TB because Jarriel "only knew he knew (sic) I was sick[.]" (Id. at p. 80). Fitzpatrick reiterated that "administration" knew he was sick, but administration did not know why he was sick. (Doc. No. 126-9, p. 11). Fitzpatrick testified that Defendant Broome saw him while he was in isolation due to the problems he was having with his knee and that Defendant Jones began providing treatment to him after Fitzpatrick was admitted to the infirmary. (Doc. No. 126-8, p. 53; Doc. No. 126-9, pp. 5–7). Fitzpatrick stated that he was in medical two or three times a day before he was admitted to the infirmary, but not every visit was recorded in his

---

[7] Fitzpatrick also testified that Jarriel saw him vomit on one occasion, and Jarriel told the unit manager to take Fitzpatrick to the medical unit. (Doc. No. 126-9, pp. 42–43). The undersigned notes this discrepancy only because, at most, this testimony reveals that Jarriel may have seen Fitzpatrick vomit once and directed that he receive medical care and treatment.

AO 72A
(Rev. 8/82)

medical files. (Doc. No. 126-8, pp. 29, 35; Doc. No. 126-9, p. 44). Fitzpatrick also stated that he was not familiar with who Defendant Paul and Defendant Chatman are. (Doc. No. 126-8, pp. 62, 67).

Plaintiff Putmon stated that he "believed" Jarriel knew Fitzpatrick was sick because Fitzpatrick did not stand during inspections, which occurred three to four times a week. (Doc. No. 127-9, pp. 7–8). Putmon also stated that he saw Jarriel and Fitzpatrick have a conversation once, but he could only assume what the two men discussed and saw nothing else which led him to believe Defendant Jarriel knew Fitzpatrick was sick. (Id. at pp. 8–9). Plaintiff Putmon testified that Fitzpatrick was coughing up blood and not eating and that he saw Fitzpatrick vomit. Plaintiff Putmon said that Fitzpatrick only told him that medical personnel were not doing anything for him. (Id. at pp. 5–6). Finally, Putmon stated that he and other inmates spoke with officers about Fitzpatrick's condition and being sick, but these officers are not named Defendants. (Id. at pp. 9–10).

Plaintiff Mosley declared that he told Defendant Jarriel on one occasion that Fitzpatrick was "terribly sick", that Fitzpatrick was vomiting on several occasions, and that he and other inmates told Defendant Jarriel fifty (50) times that Fitzpatrick needed medical attention. (Doc. No. 127-10, pp. 61–63). Mosley stated that Defendant Jarriel told him that Fitzpatrick's condition was a matter for medical personnel. Plaintiff Mosley also stated that he told Defendant Paul approximately twenty (20) times that Fitzpatrick was sick and needed help, and Defendant Paul responded by saying that Fitzpatrick should fill out a sick call request. (Id. at pp. 70, 74). Plaintiff Mosley testified that Fitzpatrick threw up in front of Defendants Paul and Jarriel three (3) times, and these

AO 72A
(Rev. 8/82)

Defendants instructed the floor officers to take Fitzpatrick to medical. (Doc. No. 127-11, p. 23). Plaintiff Mosley also testified that Defendants Jones and Broome should have known something was going on with Fitzpatrick because these two (2) Defendants were medical personnel. (Doc. No. 127-12, p. 28).

Plaintiff Smith testified that officers (i.e., not any of the named Defendants) were told about Fitzpatrick's conditions. Smith asserted that, while he never spoke to Defendants Jarriel and Paul personally about Fitzpatrick's condition, he knew complaints were made to these Defendants, and they would tell Fitzpatrick to fill out sick call requests. (Doc. No. 126-4, pp. 18, 21). Smith stated that Defendant Jarriel and Paul would have been able to observe Fitzpatrick only during inspections, but he did not see Fitzpatrick vomit in front of Defendants Jarriel and Paul. (Id. at pp. 26, 28). Smith also stated that he heard Fitzpatrick tell Defendant Jarriel that he was spitting up blood. (Doc. No. 126-5, p. 11). Plaintiff Smith declared that he feels that Jarriel had to have known that Fitzpatrick was sick because he was transferred to another prison, and only a warden can control transfers. (Id.).

Finally, Plaintiff Mann testified that he told Defendants Jarriel and Paul twice about Fitzpatrick's condition, but they did not appear to take Mann's concerns seriously. However, Fitzpatrick did not vomit in front of Defendants Jarriel and Paul, only officers. (Doc. No. 126-6, p. 17). Plaintiff Mann also testified that he does not know when Defendants learned Fitzpatrick had active TB. (Id. at p. 28). Mann declared that Defendants and Jarriel had to have known Fitzpatrick was sick because Fitzpatrick was sent to a "real world" hospital and because Mann wrote letters to these Defendants

which detailed Fitzpatrick's condition and that he was being seen in medical but not improving. (Id. at p. 16).

A review of the objective evidence of record reveals that TB is an airborne disease which can be spread by a person with active TB coughing in areas with other people. (See Doc. No. 127-2, p. 15). The most common or typical symptoms of active pulmonary TB are: night sweats, which are described as being drenching sweats leading to the need to change one's clothing and bedding; weight loss; a productive, bloody cough; prolonged fevers; and bloody sputum. (Doc. No. 127-3, p. 1; Doc. No. 149, pp. 16, 18; Doc. No. 152, p. 52; Doc. No. 154, p. 10). Nausea and vomiting are not considered to be symptomatic of active pulmonary TB. (Doc. No. 126-11, pp. 5–6; Doc. No. 127-1; Doc. No. 149, p. 21). These typical symptoms associated with a person having active pulmonary TB could be due to other conditions, such as pneumonia, bronchitis, or vomiting. (Doc. No. 126-11, p. 23; Doc. No. 127-3, pp. 1, 8; Doc. No. 149, p. 17).

The review of the objective medical evidence reveals the following. Fitzpatrick had negative screens for active TB on December 15, 2008, and December 29, 2009. Fitzpatrick made no complaints regarding any sign or symptom of active TB on December 29, 2009, and no symptoms were noted. Fitzpatrick weighed 201 pounds and had a normal temperature. (Doc. No. 126-11, p. 7; Doc. No. 126-12, p. 12). Fitzpatrick made no complaints about his physical condition while he was in isolation from December 4, 2009, through January 10, 2010 (doc. no. 126-12, pp. 17–18), although Fitzpatrick testified that he started having night sweats while he was in isolation, which was thought to be a cold and for which he was given medication. (Doc.

AO 72A
(Rev. 8/82)

No. 126-8, p. 28). Fitzpatrick was seen in medical on January 11, 2010, and complained of knee and back pain but not weight loss, coughing, bloody sputum, fever, or night sweats; he weighed 200 pounds, had a normal temperature, and had an x-ray for his knee. (Doc. No. 126-11, p. 8). Fitzpatrick received the results of his x-ray on January 25, 2010, at which time he weighed 199 pounds and had a normal temperature. (Id. at p. 9). On February 4, 2010, Fitzpatrick complained of "cold and hot sweats", vomiting and having headaches for three weeks' time, a non-productive cough, a sore throat, and a runny/stuffy nose. Fitzpatrick weighed 194.4 pounds, his temperature was normal, and he had a thick and cloudy secretion in his throat. Fitzpatrick had recently quit smoking, and his lungs were clear. After examination, Fitzpatrick was told to increase his fluids, avoid spicy foods, to take his prescribed medications, and instructed to return if his conditions continued or worsened. (Doc. No. 126-12, p. 9). Fitzpatrick complained on February 6, 2010, of nausea, vomiting, hot/cold sweats, and a burning pain which worsened when he swallowed or ate, which he reported had been happening for about a month; his temperature was normal, and he weighed 190 pounds. He was given an injection to help his nausea and acetaminophen for his fever. Fitzpatrick was instructed to return to medical if his symptoms continued or worsened. (Id. at p. 8). Fitzpatrick returned to medical on February 10, 2010, complaining of weight loss, nausea, and vomiting. Fitzpatrick reported that, while the injection gave him some relief, he still had nausea and was vomiting, though he was not vomiting blood. An abdominal x-ray was taken to rule out an obstruction, and Fitzpatrick was given an IV and medication for his nausea, instructed to follow a liquid diet for three (3) days, and told to return in a week, or sooner

AO 72A
(Rev. 8/82)

if needed. Fitzpatrick weighed 190 pounds, and his temperature was slightly elevated at 99.1 degrees. (Id. at p. 7). Fitzpatrick's x-ray did not reveal an obstruction. (Id. at p. 3). Fitzpatrick returned to medical on February 15, 2010, and complained of vomiting with green and brown matter in it and pain with bowel movements. Fitzpatrick did not report having nausea or any coughing, bloody sputum, or night sweats, but he did report being hungry. Fitzpatrick had abdominal tenderness and a fever (102.0 degrees) and was taken to a local hospital. (Id. at p. 6). The doctor diagnosed Fitzpatrick as having H. pylori and gastritis. (Id. at pp. 27–28). Fitzpatrick was returned to GSP, reported no symptoms associated with active TB, and was given his prescribed medications and informed about H. pylori disease and treatment the next day. (Id. at p. 5). Fitzpatrick was seen on February 18, 2010, and reported that he was feeling better, did not report any coughing, bloody sputum, fever, or night sweats, and was instructed to finish his medications. (Id. at p. 4). Fitzpatrick had a chest x-ray taken on February 22, 2010, which was read two (2) days later. Fitzpatrick's temperature was normal, he weighed 185 pounds, and he had "adventitious breath sounds". (Id. at p. 3). PA Cheatam recommended that Fitzpatrick be referred to general surgery to undergo a procedure for examination of the lining of his esophagus, stomach, and the first part of his small intestine. (Id.; Doc. No. 126-11, pp. 16–17). The radiologist's impression on February 24, 2010, was that Fitzpatrick had pneumonia, but TB or an obstructive bronchial lesion could not be excluded. (Id.; Doc. No. 126-12, p. 14). Fitzpatrick was again seen at medical on March 2, 2010, which is the same date Defendant Jones read Fitzpatrick's x-ray. (Id. and at p. 1). Defendant Jones diagnosed Fitzpatrick with pneumonia and accepted him to the infirmary. (Id.). Fitzpatrick was admitted to the infirmary the next

day. (Id. at p. 22). Defendant Jones ordered a CT scan on March 4, 2010, to rule out whether Fitzpatrick had an obstructive lesion to the upper right lobe of his lungs. (Id. at pp. 19, 26). Fitzpatrick had another chest x-ray taken while he was in the infirmary on March 11, 2010. (Id. at p. 13). On March 15, 2010, Defendant Jones reviewed this x-ray, which revealed some improved aeration in the lungs with "a persistent infiltrate[,]" which was a finding that was "suspicious of TB." (Id.). Fitzpatrick was transferred to ASMP the next day (id. at p. 22), and he was later diagnosed as having active TB.

The evidence before the Court reveals that Plaintiffs fail to present a genuine dispute as to any fact material to their contention that Defendants were aware that Fitzpatrick had active TB and deliberately disregarded that condition, posing a risk to Plaintiffs' health and safety. At best, Plaintiffs present evidence that Defendants Jarriel and Paul knew Fitzpatrick was throwing up, losing weight, and was sick despite being seen in medical on several occasions because inmates (including Fitzpatrick and Plaintiff Mosley) informed Defendants Jarriel and Paul of Fitzpatrick's condition when they went on their almost-daily inspections.[8] (Doc. No. 127-10, pp. 22, 24, 61, 66–67). This evidence also shows, however, that Defendants Jarriel and Paul directed the inmates' concerns regarding Fitzpatrick to the medical unit. (Doc. No. 127-10, pp. 66–67; Doc. No. 127-11, p. 23). In addition, there is no evidence that Defendant Broome had any contact with Fitzpatrick while he was housed at GSP (other than while Fitzpatrick had issues with his knee while he was housed in isolation) or that Defendant Jones was aware of Fitzpatrick's condition prior to his admission to GSP's infirmary on March 2, 2010. The undersigned notes Plaintiffs' assertions that several officers knew

---

[8] Plaintiff Mosley's deposition contains many hearsay statements. For instance, Plaintiff Mosley testified that he heard Plaintiff Smith and other inmates tell Defendant Jarriel that Fitzpatrick was vomiting, spitting up blood, losing weight, fatigued, and had shortness of breath. (Doc. No. 127-11, pp. 20, 36–37).

Fitzpatrick was very sick. However, it appears that Plaintiffs wish to impute the knowledge of these officers to Defendants and hold Defendants liable based on their supervisory positions, which is insufficient to support a section 1983 deliberate indifference claim. Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009) (liability in a § 1983 case must be based on more than respondeat superior). In the alternative, it appears that Plaintiffs wish to hold Defendants liable for an alleged constitutional violation because they knew or should have known something was amiss with Fitzpatrick. Nevertheless, the most the evidence bears out is that the medical staff treating Fitzpatrick was negligent or rendered improper treatment to Fitzpatrick, leading to the Plaintiffs' potential exposure to active TB.[9] This, too, is an insufficient basis for liability under § 1983. Allegations that a defendant "knew or should have known" are insufficient to support a deliberate indifference claim, as more than "constructive knowledge" must be shown to sustain such a claim. Franklin v. Curry, 738 F.3d 1246, 1249 (11th Cir. 2013). "To be deliberately indifferent a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 1250. Plaintiffs have failed to meet their burden on the deliberate indifference claim.

---

[9] The undersigned points to the opinions and testimony of Jacqueline Moore and Millie Reeves in this regard. Moore testified that she did not "feel that [Defendants] were aggressive enough with their index of suspicion[ ]", likely because she did not think Defendants did enough to help Fitzpatrick. (Doc. No. 149, p. 30). Moore opined that Defendants were guilty of "gross negligence in failing to diagnose Fitzpatrick in a timely manner", which led others to be exposed to TB, which, in her professional opinion was deliberate indifference. (Doc. No. 142, p. 3). Reeves testified that she feels that Fitzpatrick should have been transported to ASMP before March 16, 2010, in her opinion, but she was not going to "second guess someone because [she] was not evaluating the patient." (Doc. No. 127-3, p. 9). Reeves also testified that, given Fitzpatrick's reported symptoms, a TB diagnosis was not the first thing which might occur to a medical care provider if an inmate's weight loss could be attributed to something else, such as vomiting. (Id. at p. 8).

AO 72A
(Rev. 8/82)

## B.    Conditions at GSP

Defendants assert that there is no evidence to support Plaintiffs' claim that GSP was poorly ventilated and overcrowded, conditions which allowed TB to spread throughout the prison, and that each Defendant allowed these conditions to continue. Defendants contend that Plaintiffs offer only their own self-serving statements that the dorms were "stuffy", particularly in the summer.  (Doc. No. 125-1, p. 22).  Defendants also contend that Plaintiffs offer no scientific evidence suggesting that the size of the cells contributed to the exposure to the TB germ.  Defendants further contend that there is no evidence showing that Plaintiffs' medical conditions were caused by exposure to Fitzpatrick.  Defendants specifically contend that: Plaintiff Smith's TB infection was a different genotype than Fitzpatrick's, suggesting that the cases were unrelated; there is no way to determine the source of Plaintiff Mosley's TB infection; Plaintiff Mann already had LTBI when he was housed with Fitzpatrick and never contracted active TB; and Plaintiff Putmon never developed active TB and could have been exposed to TB before his arrival at GSP.  Defendants assert that there is no evidence that any of them acted with deliberate indifference regarding the conditions of confinement at GSP.

Plaintiffs aver that Defendants Jarriel, Chatman, and Paul were deliberately indifferent to Plaintiffs' conditions of confinement regarding the ventilation system at GSP.[10]  According to Plaintiffs, the exhaust vents in each cell had little to no circulation. Plaintiffs state that the cell windows only have minimal openings, which was not enough space for an inmate to feel a breeze in the cell.  Plaintiffs assert that there were no windows in the day room to provide circulation from the outside.  Plaintiffs also assert

---

[10] Plaintiffs' conditions-of-confinement assertions center on the ventilation system at GSP and not the population in the dorms.  It appears that Plaintiffs abandoned this portion of their deliberate indifference to the conditions-of-confinement claim.

that a reasonable fact finder could find that Defendants were deliberately indifferent to their conditions of confinement by "regularly observing Fitzpatrick's obvious symptoms of active TB and allowing him to stay in general population until March 2, 2010." (Doc. No. 138, p. 23).

Generally, prison conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). "To mount a challenge to a condition of confinement, a prisoner must first prove the condition he complains of is sufficiently serious to violate the Eighth Amendment." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004). "The challenged condition must be extreme;" at the very least, the prisoner must show the condition of his confinement "poses an unreasonable risk of serious damage to his future health or safety." Id. (quotations and alteration omitted). The prisoner must also show that prison officials acted with deliberate indifference to the condition at issue. Id. Brown v. Pastrana, 446 F. App'x 270, 272 (11th Cir. 2011).

Wendell Fowler, the Deputy Warden of Administration and of Security, affied that his responsibilities include directing and monitoring the maintenance staff and overseeing the overall management and operation of GSP. (Doc. No. 127-4, p. 3). Fowler stated that the F-1 and F-2 dorms (where Fitzpatrick and Plaintiffs were housed) consist of 54 total cells and, during the years 2009 and 2010, these dorms housed 108 inmates, or two (2) inmates per cell, which measure 7'6" by 12'5.5". (Id. at pp. 5, 7). Fowler stated that each cell in the F-unit is connected to a pipe chase, which "removes exhaust air and passes it to a turban fan on the roof of the dormitory." (Id. at p. 5). Fowler also stated that F-1 and F-2 share a pipe chase and a common exhaust and that

AO 72A
(Rev. 8/82)

exhaust air is not recirculated or combined with fresh air. Fowler also stated that the buildings receive fresh air from windows and through a vent on the side of the buildings. Fowler further stated that each cell in F-1 and F-2 has its own vent and a window measuring 6" by 58", which the inmates can open and close at will. (Id. at pp. 5–6). Additionally, Fowler declared that exhaust fans, which are never turned off, are in the common area of each dorm. Fowler stated that the maintenance staff cleans all the fans in the dorms on a monthly basis and performs seasonal airflow checks on the ventilation system. Fowler also stated that the quality of airflow in the dorms at GSP "has consistently exceeded the American Correctional Association's minimum standards[ ]" of at least 15 cubic feet per minute, even though GSP is not certified currently by this Association. (Id. at pp. 6–7). Fowler declared that the infirmary at GSP consists of 18 single-man cells containing a toilet, sink, and solid doors and walls. Fowler also declared that the infirmary cell in which Fitzpatrick was housed has two (2) doors, one of which enters into an ante-room, which prevents the air from this cell from entering the general infirmary area. In fact, Fowler asserts, the exhaust air from this cell is taken directly outside by a vent, it does not recirculate within the cell, and it does not circulate with any other air within GSP. (Id. at pp. 8–9). Finally, Fowler asserts that he has never been made aware that the venting or air circulation in any part of GSP helped the transmission or spread of the TB germ, and he would have been made aware if a problem existed because of his position as Deputy Warden of Administration. (Id. at p. 9). Defendants Jarriel, Paul, and Chatman echoed the assertion that they were never made aware of a problem with the venting or air circulation at GSP which may have helped with the transmission or spread of the TB germ. (Doc. No. 126-1, p. 6; Doc. No.

22

126-2, p. 8; Doc. No. 126-3, p. 7). Reeves also noted there was no indication that the ventilation system in GSP contributed to the spread of TB. (Doc. No. 127-3, p. 4). In fact, Defendant Jarriel commented that he did not wear a mask when he conducted the warden's inspection. (Doc. No. 126-1, p. 6).

Plaintiffs Putmon and Mann and Eugene Thomas, a fellow inmate, asserted that the windows in their cells would open, although the windows would not open very much. (Doc. No. 127-6, p. 29; Doc. No. 127-9, p. 15; Doc. No. 147, p. 2). Plaintiff Smith testified that the windows in the cell would not open and there was no airflow in the dorms, especially when it was hot outside, and Plaintiff Mosley stated that the window in his cell did not work. (Doc. No. 126-5, p. 6, Doc. No. 127-10, p. 38). Plaintiff Mosley and Thomas declared that they did not witness anyone from the maintenance staff clean the fans, air ducts, vents, the big box fans in the dorms during the summer, or their cell vents. (Doc. No. 147, p. 2; Doc. No. 151-1, p. 3).

Assuming, *arguendo*, that the ventilation and airflow systems in the F-1 and F-2 dorms were poor or insufficient, which created a serious condition of Plaintiffs' confinement, there is no evidence that any Defendant knew the ventilation and airflow systems were insufficient in any way. Additionally, there is no evidence that Defendants, perhaps armed with this knowledge, were deliberately indifferent to this condition. Plaintiffs' evidence reveals, at most, that it would get hot inside the dorms during the summer months and the ventilation and airflow capabilities were not ideal. However, there is no evidence that this condition posed an unreasonable risk to Plaintiffs' health and safety. Moreover, and as noted above, there is no evidence that Defendants knew that Fitzpatrick's condition posed an unreasonable risk to Plaintiffs'

23

(and other inmates') health and safety, as there is no evidence that Defendants knew Fitzpatrick had active TB. Plaintiffs fail to create a genuine dispute as to any fact material to their conditions-of-confinement claim.

## C. Training/Policies

Defendants contend that there is no evidence showing that any Defendant was responsible for establishing training curriculum. In fact, Defendants contend, the evidence shows that employees received training about communicable diseases, including TB, and they were not aware that this training was deficient in any way. Defendants assert that there was only one (1) reported case of active TB at GSP in the year prior to Fitzpatrick's diagnosis. Defendants also assert that Georgia Department of Corrections' ("GDOC") policies were complied with and enforced. Defendants allege that, once it was suspected that Fitzpatrick had active TB, he was transferred to ASMP, Reeves was notified, a contact investigation was initiated, and staff and inmates were tested and treated, if necessary. Defendants also allege that, had there been a violation of policy, it was the result of negligence, which is insufficient for a deliberate indifference claim. Defendants further allege that any alleged failure to enforce a policy cannot save Plaintiffs' claims in the absence of a constitutional violation.

Plaintiffs aver that Defendants' assertions that they were never told or made aware that the GDOC's training on communicable diseases was deficient or insufficient is irrelevant. Plaintiffs contend that it was the job of the wardens and deputy wardens to ensure that GDOC policies were being followed. Plaintiffs contend that Defendants Jarriel and Chatman stated that they knew coughing and flulike symptoms are symptoms of TB. Plaintiffs assert that Defendant Paul, as Deputy Warden of Care and

AO 72A
(Rev. 8/82)

Treatment, ensures that GSP employees are compliant with policies governing medical care.

"[A] supervisory official is not liable under § 1983 for a failure to train unless that failure to train amounts to a deliberate indifference." Thomas v. Poveda, 518 F. App'x 614, 618 (11th Cir. 2013) (citing Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397 (11th Cir. 1994)). "[A] failure to train [assertion] may amount to deliberate indifference when the need for more or different training is obvious[.]" Ayers v. Harrison, 506 F. App'x 883, 885 (11th Cir. 2013) (internal citation and punctuation omitted). "A supervisory official is liable under § 1983 when "his 'failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact' and the failure has actually caused the injury of which the plaintiff complains." Battiste v. Sheriff of Broward Cnty., 261 F. App'x 199, 202 (11th Cir. 2008) (quoting Belcher, 30 F.3d at 1397). The existence of a policy regarding TB weighs against a finding of deliberate indifference. Combs v. Nelson, 419 F. App'x 884, 886 (11th Cir. 2011). In addition, the lack of enforcement of a particular policy "at best shows mere negligence and is insufficient to demonstrate deliberate indifference." Brown v. Head, 190 F. App'x 808, 810 (11th Cir. 2006) (citing Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

GDOC policy requires that inmates be tested (or screened for symptoms, in those instances where an inmate already had a positive PPD test) for TB upon entrance into the prison system or a different institution, annually in their birth months, and as part of a contact investigation, if necessary. A PPD test could be given at other times, as needed. (Doc. No. 127-2, p. 19; Doc. No. 148, p. 52). Correctional officers are to receive training on communicable diseases upon beginning their employment and once

25

a year thereafter. Included in this training is a general explanation of airborne diseases, such as TB, and that active symptoms of TB are coughing, fever, weight loss, and night sweats. (Doc. No. 148, pp. 42–43, 45, 55). If an inmate is suspected as having active TB, that inmate is to be given a surgical mask and instructed on its use and the importance of keeping the mask on at all times. (Id. at p. 49). That inmate is to be separated from the general population and isolated until he can be transferred to ASMP. (Id. at pp. 49–50). If a contact investigation is to be had, the statewide TB coordinator will "arrange to skin test close and casual contacts of the TB suspect." (Id. at p. 50). Transfers in and out of the affected facility will be temporarily suspended. While the inmate suspected of having TB is being transferred to ASMP, the inmate is to wear a mask at all times. The transport vehicle is to have protective equipment, including surgical masks for the inmate and N 95 particulate masks for the correctional officers. (Id. at pp. 51–52).

Defendants Jarriel, Paul, Chatman, and Jones asserted that they were never told that GDOC's training on communicable diseases, including TB, was deficient or insufficient. (Doc. No. 126-1, p. 4; Doc. No. 126-2, p. 4; Doc. No. 126-3, p. 4; Doc. No. 126-10, p. 4). Defendant Jarriel testified that he demanded 100% compliance with TB testing procedures for inmates and staff. (Doc. No. 154, p. 20). Defendant Jones stated that he had attended several lectures by Reeves related to TB. (Doc. No. 152, p. 63). Jones also stated that an inmate suspected of having active TB was to be sent to ASMP for confirmation. (Doc. No. 155, p. 33). Moore opined that GSP staff failed to follow the policies on infection control, inmates were not screened in a timely manner, and masks were not worn except with Plaintiff Mosley. (Doc. No. 142-3, p. 3).

As noted above, Fitzpatrick was screened for symptoms of active TB on December 29, 2009, as December is his birth month. Fitzpatrick did not complain of any signs or symptoms of active TB at that time, nor were any observed. (Doc. No. 126-11, p. 7). Fitzpatrick was admitted into the infirmary on March 2, 2010, and he was transferred to the infirmary on March 3, 2010, with a diagnosis of pneumonia. Even at that time, Defendant Jones did not suspect that Fitzpatrick had active TB, as his symptoms were consistent with pneumonia. (Doc. No. 155, pp. 43–44). It was only after Defendant Jones ordered the follow-up x-ray that he noticed Fitzpatrick could have TB in his lungs. It was only after Fitzpatrick's transfer to ASMP that he was diagnosed with having active TB. (Id. at pp. 44–45). Once Fitzpatrick was diagnosed as having active TB, a contact investigation was conducted. Plaintiffs were either given PPD tests or screened for symptoms of active TB during this investigation, which occurred in March 2010. (Doc. No. 126-11, pp. 24–25, 29–32). Plaintiff Mann was screened on eight (8) different occasions for symptoms of active TB and was given a chest x-ray, which revealed normal findings. (Doc. No. 126-13, pp. 10, 18, 22, 24). Plaintiff Smith had a positive PPD test on July 20, 2010, after a negative skin test on March 30, 2010. Plaintiff Smith exhibited no signs or symptoms of active TB and was started on preventative treatment for LTBI on August 16, 2010. Smith later began having a productive cough and bloody sputum. A chest x-ray on February 10, 2011, showed an infiltrate consistent with active TB, and he was transferred to ASMP. (Doc. No. 126-11, pp. 31–32). Plaintiff Putmon had a positive PPD test on March 30, 2010, and he was referred to the LTBI clinic for treatment. Putmon had a chest x-ray, which was negative, and he did not develop active TB. (Id. at pp. 32–33). Plaintiff Mosley first reported any

AO 72A
(Rev. 8/82)

illness to medical personnel in March 2011; he was seen on May 25, 2011. Mosley complained of having a dry cough for two (2) months, chills, night sweats, and weight loss. After an x-ray was ordered to rule out active TB, Mosley was transferred to ASMP the next day. Masks were worn during his transport to ASMP. (Doc. No. 126-11, pp. 30–31; Doc. No. 126-13, pp. 29–30, 35).

There is nothing before the Court which indicates that the GDOC's training on communicable diseases, including TB, was deficient in any way or that any Defendant was deliberately indifferent to a training policy. The most the evidence shows is that the training may not have been followed when Fitzpatrick was transported to ASMP. However, this is an insufficient basis for a deliberate indifference claim. A failure to follow policy directives constitutes negligence, at most. This failure does not mean that Defendants failed to have or to provide training or that the training was constitutionally deficient. Brown, 190 F. App'x at 810. Rather, this failure to follow policy simply means that the training was not followed in at least one (1) instance. Plaintiffs have failed to show that there is a genuine dispute as to any fact material to this portion of their deliberate indifference claims.[11]

### D. Delay in Treatment (Plaintiffs Mosley and Putmon)

Defendants contend that, even assuming Plaintiffs Mosley and Putmon have shown that they had objectively serious medical needs, Defendants were not deliberately indifferent to those needs. Defendants contend that neither Mosley nor Putmon were denied or delayed treatment. Defendants also contend that Mosley's TB screenings were negative, and when he complained about a previously unreported

---

[11] Ronald McAndrew's conclusory opinions in this regard were reviewed and fail to create a genuine dispute as to any fact material to Plaintiffs' training claims. (See Doc. No. 128-1).

cough on May 25, 2011, he was given a chest x-ray and referred to ASMP. Defendants assert that they were not aware that Plaintiff Mosley exhibited any sign or symptom of active TB, nor did they do anything which hindered or delayed treatment to Mosley. Defendants also assert that, even if there were a delay, there is no evidence that Mosley suffered detriment as a result of this putative delay. Defendants contend that Plaintiff Putmon did not have any signs or symptoms of active TB when his PPD skin test was positive, yet he was given a chest x-ray and preventative treatment and was admitted to the LTBI clinic. Defendants state that Putmon does not claim that he was denied treatment at GSP; he did not submit a request for medical treatment; and he never spoke with any Defendant about TB. Defendants contend that they did not hinder or delay medical treatment to Putmon, and, even if there were a delay, there is no evidence of a detriment.[12]

In determining whether a delay in treatment rises to the level of deliberate indifference, relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Goebert, 510 F.3d at 1327. The question of whether a delay in receiving treatment worsened an individual's condition overlaps with the causation inquiry. Id. at 1329. To survive summary judgment, a plaintiff must show that the delay attributable to the defendant's indifference likely caused the plaintiff's injury. Id. An inmate who complains that delay in medical treatment rose to a constitutional violation must place "verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Simmons v. Monserrate, 489 F. App'x 404, 406 (11th Cir. 2012)

---

[12] Plaintiffs offer nothing in response to Defendants' assertions regarding Plaintiffs Mosley and Putmon. However, it appears that Plaintiffs' counsel intended to respond, as there is a letter "D." on page 33 with no heading and followed by two (2) full blank pages. (Doc. No. 138, pp. 33–34).

(citing Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)).

According to medical records and Defendants, Plaintiff Mosley received his annual screen for active TB on March 17, 2009, March 4, 2010, and February 22, 2011, as he had a positive PPD skin test in 1992. (Doc. No. 126-11, pp. 25–26, 28). Mosley was screened for active TB as part of contact investigations on November 3, 2009, March 30, 2010, and June 8, 2010. Mosley did not complain of having any symptoms associated with active TB on these occasions, nor did medical personnel observe any symptoms. (Id. & at p. 27; Doc. No. 126-13, 36; Doc. No. 126-14, pp. 4–6, 8–9). Defendant Broome saw Mosley in the chronic care clinic for his pre-existing hypertension and high cholesterol conditions on January 28, 2010, and on December 15, 2010. Mosley did not complain about any symptoms associated with active TB on these occasions, nor did he when he was seen in medical on September 21, 2010 (podiatry follow-up), November 11, 2010 (results of prostate lab tests), and December 30, 2010 (podiatry complaints). (Doc. No. 126-11, pp. 27–28; Doc. No. 126-13, pp. 32, 37; Doc. No. 126-14, pp. 1–3, 7). Plaintiff Mosley became sick in March 2011 and took over-the-counter medications other inmates had given him. Mosley's symptoms persisted, and he requested an expedited visit to the chronic care clinic, which was Mosley's first report of sickness to medical personnel. (Doc. No. 126-11, p. 29). Dr. Marler saw Mosley in the chronic care clinic for a follow-up on his hypertension and high cholesterol on May 25, 2011, at which time Plaintiff Mosley complained of having a dry cough for two (2) months, chills, night sweats, and weight loss. Dr. Marler ordered a chest x-ray to rule out active TB and a complete blood count and prescribed an

AO 72A
(Rev. 8/82)

antibiotic and cough medicine. (Id. at pp. 29–30; Doc. No. 126-13, p. 35). Mosley had the chest x-ray on May 26, 2011, and Defendant Broome reviewed the results. Defendant Broome "was suspicious that Mosley had active TB[,]" and he contacted Reeves to arrange the transfer of Mosley to ASMP. Defendant Broome stated that May 26, 2011, was the first date he became aware of Mosley's symptoms and reviewed the chest x-ray. (Doc. No. 126-11, pp. 30–31). Plaintiff Mosley was transferred to ASMP and was received in that facility on May 27, 2011. (Doc. No. 126-13, p. 28).

Defendant Broome never physically encountered, examined, or evaluated Putmon. According to medical records, Plaintiff Putmon had a negative PPD skin test on January 8, 2010, upon his entry into GSP. As part of the contact investigation, Putmon was again given a PPD skin test, which was read as positive on April 2, 2010. (Doc. No. 126-15, p. 13). Putmon had no signs or symptoms of active TB, was told of the meaning of the positive test, referred to the LTBI clinic, and was scheduled for a chest x-ray and lab work. Plaintiff Putmon's chest x-ray, taken on April 8, 2010, revealed no evidence of disease or abnormality. (Doc. No. 126-11, pp. 32–33; Doc. No. 126-15, p. 9). Plaintiff Putmon was assessed as having LTBI on April 14, 2010, and was started on preventative therapy for LTBI, and medical staff explained the difference between LTBI and active TB. (Doc. No. 126-11, p. 33; Doc. No. 126-15, pp. 13–14). Putmon was screened for active TB on June 8, 2010, at which time he made no complaints related to active TB disease, and no symptoms were observed. (Id. at p. 7). There is no evidence Putmon ever developed active TB while he was in the Georgia penal system. (Doc. No. 126-11, p. 33).

AO 72A
(Rev. 8/82)

Plaintiff Mosley testified that, after Fitzpatrick was diagnosed as having active TB and was transferred to ASMP, medical staff informed the inmates in the dorm that it was possible that they had been exposed to the TB germ, and medical staff asked him questions about having a cough and a fever but did not give him any tests or order a chest x-ray. (Doc. No. 127-11, pp. 54–55). Mosley also testified that he began having symptoms associated with active TB in February 2011, such as night sweats, fatigue, shortness of breath, and vomiting. (Id. at pp. 56–57). Mosley stated that his condition became worse, and he asked to be seen in medical in March 2011, but he was not seen until May 2011. (Id. at p. 58). Mosley stated that he never told Defendants Chatman, Paul, or Broome of his symptoms while he was in segregation from February 18 until April 18, 2011, as he did not see these Defendants while he was housed in segregation.[13] (Id. at pp. 61–63). Mosley averred that he now has shortness of breath, suffers from bouts of insomnia, and has been given ibuprofen for headaches. (Doc. No. 127-12, pp. 3–5). Mosley agreed that he thought Defendants Broome and Jones should be held liable because they were the doctors at GSP and "should have known something about [his condition] and done something about [it]." (Id. at p. 28). Plaintiff Putmon stated that he worries a lot about contracting active TB, he cannot sleep well, and he has shortness of breath. Putmon also stated that he is not claiming that he was denied medical care while he was housed at GSP. (Doc. No. 127-9, pp. 13–14).

Plaintiffs have failed to present any evidence which reveals that Defendants delayed medical treatment to Plaintiffs Putmon or Mosley and that any alleged delay in treatment caused them injury. Even assuming that Defendants did delay or hinder

---

[13] By this time, Defendants Jarriel and Jones were no longer at GSP, and Defendant Broome had become the Medical Director. (See Doc. No. 126-1; Doc. No. 152).

AO 72A
(Rev. 8/82)

treatment for Mosley or Putmon, there is no verifying medical evidence which establishes that this delay resulted in any detriment to Mosley and Putmon. <u>Simmons</u>, 489 F. App'x at 406 ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.") (internal citations omitted). Plaintiffs fail to create a genuine dispute as to any fact material to Plaintiffs Putmon's and Mosley's contention that Defendants delayed their medical treatment.

As Plaintiffs have not sustained their Eighth Amendment claims, it is unnecessary to address the remaining portion of Defendants' Motion. <u>Martinez v. Burns</u>, 459 F. App'x 849, 851 (11th Cir. 2012) (qualified immunity defense need not be address if the plaintiff cannot sustain a constitutional violation).

<strong><u>CONCLUSION</u></strong>

Based on the foregoing, it is my **RECOMMENDATION** that Defendants' Motion for Summary Judgment be **GRANTED**. It is also my **RECOMMENDATION** that Plaintiffs' Complaint be **DISMISSED**.

**SO REPORTED** and **RECOMMENDED**, this _4th_ day of March, 2014.


_____
JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)